**TRI-VALLEY PACKING ASSOCIATION
et al., Appellants,**

v.

**STATES MARINE CORP. OF DELA-
WARE et al., Appellees.**

**HUNT FOODS, INC., et al., Appellants,**

v.

**S. S. CELESTIAL, etc., et al., Appellees.**

**Nos. 16805, 16806.**

United States Court of Appeals
Ninth Circuit.

Aug. 27, 1962.

Derby, Cook, Quinby & Tweedt, and Robert H. Thede, San Francisco, Cal., for appellants Tri-Valley Packing Ass'n and others.

McCutchen, Doyle, Brown & Enersen, Russell A. Mackey and Bryant K. Zimmerman, San Francisco, Cal., for appellants Hunt Foods, Inc.

Door, Cooper & Hays, John Hays and George L. Waddell, San Francisco, Cal., for appellees and cross-appellant States Marine Corp. of Delaware.

Before POPE, BARNES and JERT-BERG, Circuit Judges.

POPE, Circuit Judge.

These consolidated suits were brought by sundry shippers to recover for claimed sweat damage to cargoes of canned goods shipped from sundry Pacific coast ports on the SS Celestial, operated by appellee States Marine Corp. of Delaware, to ports on the Gulf of Mexico in the month of February, 1956. It was shown that clean bills of lading were issued for these cargoes and it was proven that when they were delivered at the ports of Tampa, Mobile and New Orleans, portions thereof were found to be wet and damaged. Some of the loading at Vancouver, Stockton and Oakland, had occurred during the rain.[1]

---

1. It was admitted by the respondent that the vessel's log covering the voyage

stated with respect to loading at Vancouver "continued loading cargo through-

It was conceded that the cargo in question was damaged by sweat in transit. The court found that shippers had "offered their goods in carriageable condition"; that they "delivered their goods for shipment in a carriageable" condition; that the sweaty condition of these goods, when they arrived at various ports of destination, "was caused by the act of nature which the court concludes is within the term 'act of God' as used in the statute." The court held that although this damage came within this recognized exception "there yet remained on the respondent the duty to minimize the condition as much as it reasonably could in the exercise of due care." [2]

The burden of proving the exercise of due care was held to be upon the carrier. The court then stated in its findings and conclusions: "The court further finds in this case that the respondent has carried that burden except as to the matter of not exercising due care to the extent of one hundred percent. And the court further finds that as to the extent of non-compliance with the exercise of due care required of the respondent, the court has considered and now finds that this degree of the non-exercise of one hundred percent of due care can be expressed percentage-wise. And I find that this extent of non-compliance in this case is fifteen percent." The court found also "that this degree of non-exercise of due care by the respondent arose from the matter of loading the cargo in the rain."

Accordingly, on the basis of these findings, the court awarded libelants fifteen percent of the total amount of damage claimed by them to have resulted from the sweat.[3]

The primary contention of the appellants upon this appeal is that the findings thus referred to, necessitate a judgment for libelants for the full amount of their damages, not a mere fifteen percent thereof.

All parties appear to be at a loss to explain on what grounds the trial court determined that the respondent had not carried out the burden of proving due care on its part to the extent of "fifteen percent" and that it had carried the burden "except as to the matter of not exercising due care to the extent of one hundred percent." As we shall note shortly, appellee asserts that a reduction of the award to fifteen percent of the damage claimed may be justified on other grounds than those stated in the language just quoted.

We know of no rule of law which would permit a determination of liability upon the basis of the calculation of a certain percentage of due care or the calculation of non-exercise of due care, percentage-wise.[4]

In substance, what the trial court has found is that the damage to the cargo in this case was caused in part by what the Judge called an act of God and in part by negligence by the carrier. We are obliged to reject the conclusion derived from this that the extent of the

out rain" and that the log, referring to loading at Stockton, stated "continued loading in rain throughout watch. A quantity of cargo in wet and damp condition". The log stated with respect to loading of cargo at Oakland on February 25, 1956, "Heavy driving rain—continued loading cargo all hatches in wet and damp condition."

2. "The court finds * * * that a duty rests upon the carrier to exercise due care in an effort to minimize if not avoid altogether the resulting damages which would flow from this act of nature."

3. There was also awarded certain undisputed damage attributable to shortage and denting.

4. It is possible that the trial judge may have confused the situation here with the problem which arises in collision cases where the fault of both vessels causes the collision and the damages are divided. Even in such cases, the damages are divided equally. The American law makes no provision for dividing fault or damage on a sliding scale of percentages such as is provided for in some other countries. See Gilmore and Black, The Law of Admiralty, pp. 402–404, and 434–442.

carrier's non-compliance with its duty of due care was a certain percent. The result of the findings actually made by the trial judge is that we have here the situation described in Schnell v. The Vallescura, 293 U.S. 296, 306–307, 55 S.Ct. 194, 79 L.Ed. 373, as follows: "Similarly, the carrier must bear the entire loss where it appears that the injury to cargo is due either to sea peril or negligent stowage, or both, and he fails to show what damage is attributable to sea peril. * * * The vessel in the present case is in no better position because, upon the evidence, it appears that some of the damage, in an amount not ascertainable, is due to sea peril. That does not remove the burden of showing facts relieving it from liability. If it remains liable for the whole amount of the damage because it is unable to show that sea peril was a cause of the loss, it must equally remain so if it cannot show what part of the loss is due to that cause." [5]

What has just been said, particularly in the last footnote, furnishes us a convenient starting-point for a discussion of the cross-specifications of error made by the appellees. In two of those specifications appellees assert there was no evidence of fault or neglect on the part of the carrier in the manner of loading, and no evidence that the manner of loading caused the damage. All that need be said with respect to this attempt to characterize the findings as clearly erroneous is that we do not agree;—we are of the opinion that the evidence is sufficient on these points.[6]

▮ Appellees also contend that the burden of showing carrier negligence was on libelants. This is simply not the law. Cf. States Marine Corp. v. Producers Cooperative Packing Co., 9 Cir., 310 F.2d 206, and see Gilmore and Black, The Law of Admiralty: "The Burden of Proof" pp. 162–163.[7]

▮ The final specification of the appellees is that libelants failed to sustain their burden of proving the cargo's freedom from inherent vice and insufficiency of packaging. Here appellees rely on the case of Niel Maersk, 2 Cir., 91 F.2d 932. For the reasons indicated in States Marine Corp. v. Producers Cooperative Packing Co., supra, we think the Niel Maersk case is not apposite here. That

5. The necessary conclusion is stated with more accuracy by Gilmore and Black, supra, as follows: "Thus, in a sense, the absence of negligence as a concurring cause may be said to enter into the very definition of a sea peril, so that, in order to establish an exception under this clause, the ship would have to establish freedom from negligence." (p. 140) And "4(2) (c) and (d) ('perils of the sea' and 'Act of God') are in a special position, for, as we have seen, absence from negligence is in a sense a part of the definition of each of these perils, so that it would seem inevitable that the carrier remain liable if his negligence concurred in causing the loss." (p. 147)

6. For instance the vessel's third mate, with years of experience in this sort of thing, testified that loading of wet cargo "would set up a situation where sweat is likely to form." A marine cargo surveyor, called by respondent, who inspected the loading of this vessel in the Bay Area ports for the ship owner, although he testified he did not see any wet cargo, stated that damp and wet cargo should be removed from the vessel and that if cargo is getting damp it would be inadvisable to continue loading in the rain. When this testimony is added to the facts shown in the log, footnote 1, supra, it appears to us that the court was fully justified in finding that there was negligence in loading in the rain thus described, and that such negligence contributed to cause the damage shown.

7. "As we have seen when dealing with the substantive effect of negligence or other fault in 4(2) (a) to (p), what this comes down to is that the carrier (with the special exceptions of 4(2) (a) and (b) has sooner or later the burden of establishing his own freedom from fault except where he has shown that the loss was caused by overwhelming force of third persons, some fault in the shipper or the goods, or the attempt to save life or property. This leaves with him the burden of explaining a loss and exonerating himself from the imputation of fault in almost all cases in which it has not been demonstrated that at least a part of the fault lies with somebody else. This scheme of allocation of burden of proof seems well-constructed."

was a case which dealt only with the internal condition of cargo, where that condition "was not within its [the carrier's] knowledge." In this case, the condition of the cargo here relevant, was external and visible, within the carrier's knowledge or its duty to know. We find no reason to question the trial court's finding that the shippers "delivered their goods for shipment in a carriageable condition."

Appellees argue that what the trial court attempted to do in this case, and did do, was to find that eighty-five percent of the damage suffered was caused by the act of God or peril of the sea, and that fifteen percent was caused by the negligence of the respondent, in loading the cargo in the rain and permitting moisture and dampness to reach it.

Actually the trial court made no such finding, and such a statement cannot be found in the findings which the court dictated to the court reporter. The nearest the court came to any such statement was its finding: "The Court finds that some moisture, some dampness, was present in connection with the loading of these canned goods, but it is a matter of degree as to how much of that moisture may have affected the resultant sweat that did take place." [8]

But the main reason we are unable to find any such finding as that argued by the appellees is that there was no evidence to warrant a finding that would show what part of the loss was due to negligence or what part of the loss was due to peril of the sea or act of God.

It is not clear just how a carrier might go about showing such a thing or proving the part of the damage which was due to these respective causes. If, for instance, it were demonstrated that the rain which was testified to and admitted in the record, occurred only while a certain hatch was being loaded, and that during that time other hatches were closed, then conceivably the trial court might find that only the damage which occurred in that particular hold was attributable to the negligence which the court here found.

But this is not such a record. Thus respondent admitted in response to interrogatories or requests for admissions, (footnote 1, supra), that its log showed with respect to the loading of cargo at Oakland, the following entry: "Heavy driving rain—continued loading cargo all hatches in wet and damp condition." It was also admitted that the log showed entries disclosing that at Vancouver the ship "continued loading cargo throughout rain"; and that at Stockton, "Continued loading in the rain throughout watch. A quantity of cargo in damp and wet condition". It was admitted that cartons listed on fifteen bills of lading covering approximately seventy-five percent of the total, exhibited evidence of having been affected by moisture. The deposition of the third mate showed that the damaged cargo was "just about stowed in every hatch, I imagine, if I remember correctly." A marine surveyor who surveyed the damaged cargo, counted 4300 cases which showed evidence of damage, and he testified that these represented items on a substantial number of the bills of lading. His written certificate and report recited that he found items wet from sweat and/or condensation in Nos. 1, 2, 3 and 4 holds.

When this evidence is considered in the light of the fact that there was no attempt whatever to sort out what part of the loss was due to what cause, we must conclude that not only was there no finding as to what part of the loss was due to the negligence, but there could not be any such finding upon this record. We therefore must conclude that the ap-

---

8. That statement would come nearer to approaching a finding of the kind we have referred to here if the last "of" were omitted from that sentence. It is said that the visiting Judge who tried the case left town immediately after he had dictated his findings to the court reporter and that they were filed without his having an opportunity to read them over. Even if the word "of" were interpolated by the reporter, and the Judge should be considered to have made the statement without the insertion of that word, it still falls short of a finding to satisfy the rule in the Vallescura case, supra.

pellees here are in the situation in which The Vallescura found itself in the case cited—that is, "the carrier must bear the entire loss."

Accordingly, the judgments and orders here under review must be reversed, and the causes are remanded to the district court with directions to enter judgment for the libelants for the full amount of their damages.

It Is So Ordered.